24-19-10 Michael Dahdah v. Rocket Mortgage LLC Oral Argument Not to Exceed 15 Minutes Per Slide Counsel Jay for Rocket Mortgage, LLC Good morning, Your Honors. May it please the Court, I'm William Jay for Rocket Mortgage. I'm going to try to save three minutes for rebuttal. I'd like to start out with two important and undisputed aspects of this case. There's no dispute that Mr. Dahdah visited the website, browsed through the flow of webpages, and clicked the button. And there is also no dispute about the content of the relevant webpages. In other words, no dispute about the authenticity of the screenshots or the video that we've submitted. Under those circumstances, that means that this case presents, under California law, a de novo question, whether the notice language was reasonably conspicuous. And then I think the second point really just follows naturally. If the notice point was reasonably conspicuous and it told the website user that by clicking the button, you're agreeing to the terms and conditions, then that is enough to dispose of this case. I think it's undisputed. I'll ask your friend on the other side about whether it is, in fact, a question of law. So in our first case, I thought a question, what we considered a question of fact, is a question of law. I could see this being a question for the jury. And the reason why I would make analogies to trademark law, likelihood of confusion, secondary meaning, you usually see consumer studies, how has a consumer taken the trademark. That makes a lot of sense to me. I've got to say, it seems quite arbitrary for us to like, OK, we're looking at these various things, and we're just using our gut instinct on whether something is reasonably conspicuous. That type of evidence seems to me would be helpful. But I guess if it's foreclosed by California law, so be it. It is foreclosed by California law. And Judge Hamilton of the Seventh Circuit, I think, has written a concurrence basically saying exactly what Your Honor just said, that I could see it making sense for it to be a fact question. But I think that the BD case that we've cited and the Sellers case that it cites make pretty clear that California sees this particular formation question when the historical facts are undisputed as a question of law. And I think the reason that that makes sense, and I acknowledge that you might say that, well, then why doesn't this produce a different result in trademark? But I'll say it anyway, that the judges who hear these cases are ordinary consumers of internet services as well. And there is a sense in which this doesn't require specialized knowledge to assess. Well, it just doesn't seem like a question of law to me. The best thing I've got going for us is comparing all of the iterations. And yours seems maybe better than this one, but maybe worse than that one. And that's kind of where I'm kind of at, I would say. I do think that those analyses would be useful. So I guess starting why I think yours is maybe worse than some others, the fonts does seem quite small to me. Maybe Game of Thrones was the hardest to read, whatever that Ninth Circuit case was. But yours seems also pretty small. So I guess, why not make it bigger? I mean, we could adopt a rule that it has to be like 14 point font. So the sort of common sense commercial answer that I'll give you is that in this context, making text bigger means more scrolling. In other words, the requirements that websites include more language on the website itself, or that that language be bigger, that just means that there's more content for a website user to scroll through. And it makes it more user friendly. And as the district court got at in a different way, and I think came to the wrong conclusion, it does make it easier to fit more content on the screen together. So in other words, the button and the notice language and the hyperlink to the terms of use are all on the screen together. Obviously, at some point, if you blow it up too big, that wouldn't be possible. So does the nature of the interaction make a difference? You've got the Google case and where there's an expectation of a continued relationship. I don't think you have that here. Somebody is clicking for a one-time evaluation of the mortgage. Would that type of consumer or you know, that type of plaintiff expect that there would be terms and conditions that include things like arbitration and the types of things you would see in a contract for a continued relationship? I think they would. So let me take a step back about what the actual service that the user is. Well, first question is, does California law make a distinction? Do you conceive that California law makes a distinction? It's a factor. The Ninth Circuit in Kibaugh said that it's a non-exclusive factor, and it shouldn't be the dispositive factor, and it reversed the district court in that case for making it the dispositive factor. But in this case, I think it's a factor that helps us. And the reason for that is, if you look at the entire flow of the series of websites, you know, a user comes to this website looking for information about refinancing their loan. And so if you see on the second screen, for example, that you're going to enter this information so that we can find lenders for your refinance. So in other words, you're putting this information in, but the expectation is that Lower My Bills is going to match you with a number of lenders for your refinance. You're putting in financial information about your current loan. So I think that that does suggest, one, that this is the type of submission of information that you would expect to be governed by terms and conditions. You're going to be contacted by not just Lower My Bills, but by the lenders that you've asked to be matched with. And that naturally suggests the types of terms and conditions whereby you give permission to have your phone number or your email address used to provide the very contact that you're using the service for. So that's one piece. And the second piece is that the lenders themselves are separate from Lower My Bills. So you're expecting, once you finish, you know, or texts, depending on what you've consented to, from the different lenders. That is a continuing relationship, and it is the kind of continuing relationship that would make you think, even if it weren't conspicuous, right above the button, that this is going to be governed by terms and conditions. But certainly there's no suggestion in California law that sort of the nature of the relationship can detract from the text that's right above or adjacent to the button. I'm sorry, you said this information is above? The terms and conditions are below the button, right? On the bottom. So in the example that we've discussed first in our brief, which you'll find at page 15 of our blue brief, although this is the website, the screenshots from Mr. Dada's second visit to Lower My Bills, you'll see that above the button, it says, by clicking the button and then immediately below the button, you'll see in the very first line, a hyperlink to the terms of use. That hyperlink is blue. It is underlined. It is set apart from the rest of the text there. That's exactly what the California case law suggests is, I think Judge Ryan Nelson of the Ninth Circuit has called this the platonic ideal of the hallmarks of a hyperlink. So under those circumstances, we don't think that the district court's rationale that, you know, maybe you could scroll just up to the button and miss anything that's beneath the button that just has no operation here because right above the button is this language that says, by clicking the button below, et cetera. Now to be clear, we think that if Mr. Dada hadn't visited the site that time and we were only looking at the first set of screenshots, which you'll find at pages 10 and 12, we still would win. I mean, so the language adjacent to the calculate button on page 10 of our blue brief, it's quite clear. I mean, it's short. It's set apart. It includes, again, a conspicuous hyperlink to terms of use. That is in blue. It's underlined. Even the district court acknowledged that there are not a bunch of distracting elements on this page that take the eye away from it. What about the second one, though? The second one has paragraphs worth of information. Do you think it makes a difference how much? So like the Airbnb case and maybe another one, it was just like that. But the second screenshot, it has four paragraphs worth of information. So I agree that the second screenshot, if it were the only one we were relying on, it would be the hardest one for us. But bear in mind that this is the fifth screen. It's after the fourth screen, which is the screenshot we've just been discussing. So you've already clicked. You make them click so many buttons. It would be like dispositive. Why A couple of things about that, Your Honor. So if you look at the entire flow, you start with just very generic information about what zip code you live in. And then over the several screens, you start to fill out more information about yourself and your loan. And then on the fourth page, you give your email address. And on the fifth page, you give your phone number. And you can see why that you'd want to have more specific language about the phone number, for example. And then it says, by clicking the button above, you express your understanding and consent to be matched with and contacted by up to five participants. So why don't you just have that as a click? Like there's a pop-up box and it says, I think that some folks do this. I forgot what the case law calls it. But it says, I agree box or whatever. It seems like the reason you wouldn't do that is it's like consumers don't want to waste any time. But you already make them go through several clicks. So that seems to be less powerful to me. Well, in the smartphone context in particular, I think that a consumer actually prefers to fill out a couple of fields and then advance to the next screen rather than load one big long page that has 25 fields in it and go through it. I mean, Judge Boggs, sitting by designation in the Ninth Circuit in the Oberstein case, pointed out that, sure, click wrap, where you actually check a box before advancing, is the safest means. But that's sort of like a safe harbor. It is not required. So that's my point. Why not? Yeah, why not? I think the answer is the one I've alluded to a couple of times, that it's a more user-friendly experience to load a smaller web page with fewer fields on it that you don't have to advance through so that you can then advance to the next screen. So that would be a rule, right? So what I'm troubled by is a standard where the industry is unclear of what will not be a contract and what will be a contract. And so do you think that there is any wiggle room for a rule if we go beyond? So obviously, the case law says you don't need the click wrap. But is there any type of rule that we could adopt that would give clear guidance to everybody about what is required? Because I don't necessarily see that now. It seems like case-by-case, fact-bound, and everybody is just in the dark on whether the particular judges they get will see this that way. I understand the point. And certainly, my client would like to know the rules of the road as well. But I do think that a couple of principles have emerged from the case law and that I think the does take to be relatively settled. And one is that when you have notice language adjacent to the button that you're clicking, and that notice language says, by clicking the button, in other words, it's not ambiguous as to what action you need to take, that that's conspicuous enough to advise a reasonable user. And of course, here we're talking about smartphone users who could certainly zoom in if they needed to look at it at a larger size. That's conspicuous enough to advise them. And I recognize Judge Murphy about the several paragraphs of text at the screenshot on page 12. That's probably more of an edge case. But because of the way this visit went, we don't need that page 12 screenshot to be the exclusive basis. And I do think contextually, having just agreed to, have been admonished that by clicking the button on the page 12. Maybe I don't understand the facts. But why did he encounter different pages on three different occasions? So the first and third are the same. And the second, I think he just ended the website in a different way, I think. I'm honest. The record does not answer that question. Only that a visitor who came to lowermybills.com on the date of his second visit would be presented with this flow of web pages as opposed to the other ones. But I think the question was, he did visit the web page three different times. Yes. And completed all information three different times. That's right. Why wouldn't he get that? Is there a reason for that? Was it non-receptive the first time? Why would you go back and do it again? So perhaps that's a question for the other side. The declaration that he submitted doesn't answer that question. He initially tried to say that he had not consented to receive information at all, which I think his counsel conceded in the district court hearing that that's not correct. One more question. I know your time is up, but I was just curious about this. So are there limits to what the terms and conditions can be? So what if the terms and conditions, because the vast majority of people are going to click on this and not read the terms and conditions. That would be my instinct. And what if the terms and conditions said you have to pay us a million dollars? So that would be striking to me that that would be enforceable. And I'm just curious what the law would be on the enforceability of the terms and conditions. Right. So I think that, as we know, this is a Federal Arbitration Act case. And so the validity of a contract to arbitrate has to be judged based on state law principles that don't disfavor arbitration. So in other words, just like the basic background rules of unconscionability. And I took your question to not necessarily even assume that there's arbitration at all. Yeah, no. So this could be, say we say that this is a contract. It strikes me that, I mean, people do this. They don't read the contracts that they sign, and they're still bound by it. It's just in this scenario, I think the reasonable expectation of a consumer is that the terms are going to be basically mundane. And maybe it'll take my privacy. Maybe I'll get some phone calls. But it wouldn't be anything more significant. And I wonder what principle of law would suggest that if something was really outrageous in the terms and conditions that it would not be enforceable. So California's unconscionability doctrine has two parts. One is called procedural unconscionability. The other is substantive unconscionability. And there's sort of a sliding scale so that the more of one, the less of the other has to be shown. I think what you're describing would be sort of a combination of substantive unconscionability. In other words, like that the term would not be expected and would be wildly one-sided and unfair, et cetera. And that it would be presented in such a way as to not be noticed. And the California courts have been dealing with fine prints used colloquially in contracts for decades. And there is a body of law on that. But there's no unconscionability argument about this case except for the other side sort of stab in the direction of the contract being incomplete. We think that the FAA would take care of it. So you would distinguish your site from the answer more site by saying that the warning that by clicking you're agreeing is above the click button. Is that how you would distinguish that case? That's one of the distinctions. That's right. And how else? So you're referring to the decision from the California Court of Appeal. That case also mentioned the fact that what you're buying in that case is just an answer. I pay a little money and I'm getting an answer and you don't expect anything further after that. And for the reasons that I've set out in the colloquy that you and I had earlier, Judge White, I don't think that those are the facts of this case. That you would expect more of a continuing relationship. You're submitting financial information about your loan and you're expecting to be matched with lenders who can help you lower your bills. That's why users come to this website. In other words, there's no trick about what kind of service is being offered. It's called lower my bills and it says right from the beginning that we're going to help you find lenders for your refinance. Okay. Thank you, counsel. You'll have your full rebuttal. Thank you, Your Honor. May it please the Court, my name is James Wertheim and I represent Michael Dada. I'd like to try and answer some of the questions you raised in the course of counsel's argument. I do ask the first question of why isn't this a jury issue? And the first answer to that question is because Rocket Mortgage bears the burden of proof on a summary judgment standard to show that there's an enforceable arbitration contract. They have to get there first before we talk about anything. And the trial court found that they didn't even get to that level of proof. Now, we would submit that if you find there is an issue of that this is, they met the summary judgment standard. There is a trial required at that point because we have contested the conspicuousness and the assent. Well, I mean, this is again, it's a mixed question about the facts are largely undisputed. We see them before us and it's just whether this information is sufficiently conspicuous. At least that's how I understand the California case law and then plus the being bound or the intent to be bound. On conspicuous, I thought the California state courts had suggested it's just a question of law if the facts are undisputed. It's a tough, I don't have a great answer. My instincts would be, it's not, you should have some consumer studies. I'm not a reasonable consumer, I suppose, or I don't know what a reasonable consumer is. I would find that quite useful, but that ship has sailed, at least in the circuits. The circuits all seem to be doing this just from a facial review of the relevant website. But that's only the first step. Okay, that's only the first step of does the defendant, does the party moving to compel arbitration, meet the summary judgment standard of proving there's no material issue of fact. What would be the issue of fact? The issue of fact is whether or not this presentation is conspicuous. That's where I guess I, the California courts of appeals seem to say that that's not an issue of fact, that it's one for the court. Well, but again, you're looking at it, at the first, they're talking still about the first step in this of whether defendant meets its summary judgment burden. And it's kind of confusing and it took me a long time to get to this point. I mean, the courts have compelled arbitration, the Ninth Circuit, the Judge Boggs' opinion, compelled arbitration, said as a matter of law, this was sufficiently conspicuous. Because the defendant met its summary judgment burden at that point. If they don't meet their summary judgment burden, then it's a matter of law that they failed to compel arbitration. The issue then becomes is, does... I agree with you that it would be either way. What happens next? You seem to be saying that then the jury decides whether it's conspicuous? It's like any other summary judgment case, right? If the defendant doesn't carry its burden and the plaintiff presents evidence to the contrary, it goes to a jury. It's both conspicuousness and dissent. It would both go to a jury because Mr. Dada threw affidavit. You're saying that the defendant gets two chances? First, convince the court that it's conspicuous as a matter of law and for summary judgment. And if you don't win that, do you get a chance to convince the jury that it's conspicuous? The defendant has to first prove that it meets its summary judgment standard. And it would be like any other contract case. I come in and say, I entered into a contract with Judge White for her to buy my car. And Judge White comes back and the court goes, okay, there's a contract, there's a dollar amount, there's a date, there's the things necessary for a contract. I'm sorry, are you saying that if the court finds that they met their burden, you still can prove? So what happens then? Does it go to arbitration? No. Because we submitted contrary evidence, it would go to a jury to decide these issues. If there is, then it goes to arbitration? Correct. And are there cases that spell this out? Yes, I think all of the cases lay this out. Let me get you the best site I have for this issue. This wasn't one we cited in our brief, but there are cases we cited in our brief that lay this standard out very clearly. And again, it's no different than any other contract case. I say, you agreed to buy my car. You say, no, I didn't. It goes to a jury. Unless it's so clear that what you're saying is not true that the judge finds as a matter of law. But it is a mixed- Getting back to just this question, to be honest, I could not read the Game of Thrones all that well. And the Ninth Circuit found that that was conspicuous enough. This strikes me as a much easier case than that one. It was a black background with a gray font. It was quite small, and they upheld it. So how would you distinguish that case? Well, I'd distinguish it in a bunch of ways. And the other question Judge White asked that I want to answer is, why does the type of transaction matter? And absolutely. So if I'm going onto a website to sign up for a credit card, I'm going to expect that I'm going to enter into some kind of contractual agreement with that company. In this case, we would submit, despite what Rocket Mortgage alleges, that there is absolutely zero indicia of somebody coming to this website to enter into an agreement with Lower My Bills. And as you said, you go through many of these steps. What is it that you see, if you went to that website and you looked at that and said, what is the thing you see? A calculate button. I don't think anyone can dispute that that is the primary thing that they're wanting to show. And again, don't forget, it's on a cell phone. It's not on a big screen. It's not on a piece of paper. It's on someone who's there who's going to hit that button to see if they want to proceed. This isn't even the final stages. This is, I want to proceed. There's no transaction. There's no sign in. There's no sign up. There's no any indicia that someone is agreeing to a continuing relationship with Lower My Bills by hitting that calculate button. They're getting information. Is there, I mean, Lower My Bills is providing a service to them. They may. Essentially a matchmaker. They may provide a service. I mean, you don't have to accept the out results, but you are still getting, I mean, I assume you're going there because you're looking to refinance your mortgage. You're going there to, in my opinion, you're going there to determine whether or not there is a possibility that you will have a better result. I would agree with that. Why isn't that, why wouldn't the reasonable consumer think that, well, so why are they doing this? They're giving me a free service. Well, it's not that there is no service. I would not argue that there's no service, but you don't sign up with them. You don't pay them. You don't enter into a contract. They refer you to a third party. And while there is some service there, there's no, as you said, I think is in the, there's no reason that someone is going there thinking I'm entering into a contract with lower my bills that will bind me to arbitration with some third party, not lower my bills, some third party by hitting a button that says calculate. And, you know, I would argue that it's, as a matter of law, they fail to meet their burden, that it's conspicuous because the only thing that isn't, you know, again, we're looking at summary judgment standard. The only thing that weighs in their favor is the blue hyperlink. The font is tiny. You know, you ask why don't they make it conspicuous? Because they don't want to. That's not what they're selling. That's not what they want you to do. They want you to hit the calculate button and keep moving on. And knowing that no one is even going to see this gray font and the one line above the one in the one document where there was one line above, that doesn't change anything. You can't even see it. You look at the rest of the page and every single item on that page is clear. But, I mean, they're telling you that there are terms and conditions, right? Well, they're telling you that there are terms. They don't say terms and conditions. They say terms. And as the judge, Judge Bruffy, I think pointed out, the terms are three paragraphs long. There's a privacy policy. You could easily think it's for a privacy policy. There's an affiliate network policy that you're agreeing that these other parties can send you information. But again, you're not there to enter into an agreement with Lower My Bills when you're hitting that calculate button. You're determining whether or not you want to move on. But you're being told that you're agreeing to the terms, right? Those words are there if you can read them, if they're clear, if they're conspicuous, but that's the whole issue, right? The proximity is an issue. And we think proximity weighs against them. But again, they have the burden of showing there's no issue. So how does it weigh against them if the warning's right there over the button? Well, because all of the terms and all the rest of it is below the button. And that's what the trial court found on their motion for reconsideration. They said, yeah, there's this line above the button. First of all, you can't see it. It's in tiny gray font. If you look at even the McDonald case, which is a case that we've cited that a rocket mortgage was successful in pursuing, but it was a rocket mortgage site. They said, dark black font is the industry standard. And they distinguished the Dada case in that one. Rocket mortgage itself distinguished the Dada case. They said, we're different. We have darker font. We have a warning. Like you said, a box. Why doesn't a box come up and say? This website had something that said, below all this where you click the button, there was a heading that warned that your terms and conditions, that you could see it. I don't think anyone can look at this website, with all due respect, if you think I'm wrong, but can look at this website and say, rocket mortgage, or lower my bills, wanted people to know their terms and conditions. Rocket mortgage had every box was huge. I mean, you could say that about... I guess the problem I have with your side is there just seems to be a lot... I do worry about providing a clear rule in this context. And to be honest, if I read the precedent, the precedent all seems to uphold terms and condition type data that are somewhat similar. I would disagree with that. I mean, there's the Second Circuit case, the DC Circuit case, and several from the Ninth Circuit. And then you had the 28J on that recent opinion. There's two of them. But the earlier Ninth Circuit opinion struck me as quite distinguishable, just on the intent element, because it didn't actually say clicking would bind you to these terms and conditions. Yeah. And I would say, Judge, if you look... The reason the courts, I think, do this on a case-by-case basis is it's almost impossible to compare apples to apples on any website, right? The ones that they're agreeing to it, number one, there's a different reason for being on those websites. They're signing in. They're agreeing to a contract. They're doing some service that's ongoing where they actually are signing up for something that doesn't exist here. There are some that the box is separate, totally separate, on the side, so you can see it. I mean, I've started with the mortgage cases way back when. And if you remember that, you know, the mortgage cases, it was buried in fine print at the beginning. And the court said, this isn't telling people they're entering into agreement. By the end, there was a separate page that said arbitration agreement at the top. And, you know, right above your signature, it said, by agreeing to this, you're agreeing to arbitration. You know, there's no... The word arbitration appears nowhere in any of these pages. There's no reason anyone would think that terms and conditions automatically includes arbitration. But we don't... It doesn't have to. No. Right. Okay. But we don't, you know... There's a third step we've kind of left out. We touched on it, basically, when you talked about a click wrap. The different types of agreements, there's a click wrap agreement, which Judge Murphy described, pops up and you read through the terms and you have to click on something and actually say it. Those are always enforceable, almost always enforceable, because someone is affirmatively reading the stuff. And if you look at the Chabala case, it kind of distinguishes these things. There is a scroll wrap, where you have to do the same thing. You read all the terms and conditions, you have to check at the end. There is a browse wrap, which is what we contend this is most like, where you just use the website and are bound by the terms. And then there's a hybrid. They call it a sign-in wrap. I would say this is not a sign-in wrap, because we don't sign in for anything. We don't sign up for anything. It's more like a browse wrap. And when you look at the reasonable person standard, why are they there? And you look at the type of agreement, what is it? This is, at best, a hybrid, but closer to a browse wrap, which are never enforceable. Browse wrap, per se. But you are clicking something here. But you're not. You're not just browsing. Well, but the browse wrap is clicking something or using the website. And again, not all of this is defined. I have to admit that there are a lot of gray areas. But it's using the website as the assent, right? And there's a higher standard for disclosure in those cases, for the very reasons the court's laid out here, is you're not expecting it. You're not looking for it. You don't have a reason when you're there to expect to be signing a contract for arbitration with a third party. You're looking there to see if you get a result that makes you happy, and you want to go on, and you want them to send you stuff. And I think that it's important. Oh, I've seen my time's up. May I finish this? Yeah, you can finish your last point. I think it's important to read, and if you read every one of the cases, and the Berman case, Your Honor, I think is very much like this case that the Ninth Circuit decided about three years ago, where there was light gray font, and it found as a matter of law, it was not conspicuous. But each of these cases say the same thing. They have control. They have control of the website. They can make it very clear. They chose to not make it clear. And by choosing to not make it clear, they risk what the lower courts did, in this case, in saying, you can't compel arbitration. Okay, thank you. We'll hear rebuttal. Thank you, Your Honors. Just a few points. And just to begin back with that screenshot on page 15 of the brief, it does say, by clicking the button below, you acknowledge consent and agree to our terms at the bottom of this page. What our friend on the other side said is, those words are there if you can read them. But I think that they compare just at least equally, probably favorably, to a number of cases that have upheld arbitration agreements like these, in notice language like this. It's in contrasting font. It's not in light gray. You can look at it for yourselves. It's in contrasting font on a white background. And most importantly, and this is one further answer, Judge White, to your question earlier about why Sellers is different from this case. And this is the same point made in the BD California Court of Appeal case as well, is that this is in the area where you would expect to find this language. In other words, it's right adjacent to the button. It's not off in Siberia somewhere on the website. And so I think, same answer I gave Judge Murphy earlier. I think that in a case where- It wasn't in Berman? It wasn't the little blurb on top of where you had to click? So the problem in Berman is that the Ninth Circuit said that the hyperlinks weren't visible. In other words, you could see that there's language there. But it was not just small and gray, but the hyperlinks were also gray and not called out as hyperlinks. So your eye isn't naturally drawn to the fact that here's a link that's taking you to another page where you'll find the terms of use. Whereas in this case, right under the button in that first line, you see the bright blue terms of use link underlined just as best practice for hyperlink. One question. I thought the third party point was a good one. You might think that you're going to agree to be bound to lower my bills. You wouldn't necessarily think you're agreeing to arbitrate with some financer down the road who you ultimately refinanced with. I would think that if you ended up refinancing, that would be a completely separate contract. And these terms wouldn't particularly apply at all. So the question that you're asking, I think, really goes to the inquiry notice point. So in other words, if the notice admonishment that by clicking the button you're agreeing to this is reasonably conspicuous and the hyperlink readily points you to the terms, so then I think the question you're asking is really about what the scope of the terms is. But just to answer your question in the context of this transaction, from the very beginning, this flow of web pages says it's going to match you with lenders who can help with your refinance. And the consent that you're providing is to be contacted by email or by phone. And lower my bills is not itself a lender. It's going to match you with lenders. That is the free service that you're signing up for by putting your information. But you don't think that you're agreeing to anything whatsoever with the lenders, with the potential lenders. I think you are at least agreeing to be contacted by the lenders. Okay. That's explicit. Right. And maybe that goes to the underlying case that he's complaining about. He got a barrage of phone calls. But would you think that you're agreeing to arbitrate with any of those lenders if a dispute arises and you haven't entered into a contract? Let me give you a two-step answer to that. Because step one is just to point out that, you know, he didn't even form an agreement with lower my bills itself. So in other words, this question that you're asking me is not the distinction the other side is making. They're saying there is no agreement at all. So then second point, I think if you're on inquiry notice of these terms, if you look at the terms, like it's right there in point two, that the arbitration is with not just lower my bills, but also with related companies. The list of related companies is linked from these web pages. And more fundamentally, you absolutely agree, because you don't even have to go to the terms for this point, this is in the screenshots themselves, that you were agreeing to be matched with and contacted by providers in the provider network. That's what the service is. And so it's a little odd for the other side to say that their client came to the website, asked to be matched with lenders, and then is suing under the TCPA for the lenders that he asked to contact. But that's the merits. That's the merits. It is, but here's the overlap, right? That he's saying that he didn't form an agreement at all. He didn't agree to be contacted. He didn't agree to be matched with lenders. He's saying he didn't agree to anything. And that, I think, is why my friends attempt to use the declaration to say that there is a fact question in this case. It does not work, because all the declaration says is, essentially, I did not read the text. It was tiny, et cetera. The conspicuousness of the notice language is a question of law, as we've all been talking about throughout this argument. And so the declaration saying, I didn't read it or I found it too small subjectively, that's not legally relevant. And so the question before this court is, given that all the historical facts are undisputed as a matter of law, is this reasonably conspicuous under the standards that California law sets? If there were some fact question, you would order a jury trial. But of course, the district court in this case didn't say that we hadn't met our summary judgment burden. She said that we lost as a matter of law. The district court said we lost as a matter of law and denied our motion. She didn't set it for a jury trial. So that's why we asked you to reverse. Okay. Thank you. The case will be submitted. Thanks for your helpful arguments today.